IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| HELENA KRIZEK, Birth Mother of BIANCA HELEN KRIZEK (DECEDENT),<br><br>               Plaintiff,<br><br>     vs.<br><br>THE QUEEN'S MEDICAL CENTER; HAWAII RESIDENCY PROGRAM; DR. MATTHEW DUMOUCHEL; DR. NOBUHIRO ARIYOSHI; DR. ITTIKORN SPANUCHART; DR. WENDY W. HSU; DR. HAO CHIH HO; and DR. T. SCOTT GALLACHER,<br><br>               Defendants. | CIV. NO. 18-00293 JMS-WRP<br><br>ORDER: 1) GRANTING DEFENDANT DUMOUCHEL'S *DAUBERT* MOTION, ECF NO. 249; AND 2) DENYING IN PART AND GRANTING IN PART OTHER DEFENDANTS' *DAUBERT* MOTIONS, ECF NOS. 250 & 251 |

**ORDER: 1) GRANTING DEFENDANT DUMOUCHEL'S *DAUBERT* MOTION, ECF NO. 249; AND 2) DENYING IN PART AND GRANTING IN PART OTHER DEFENDANTS' *DAUBERT* MOTIONS, ECF NOS. 250 & 251**

## I.  INTRODUCTION

Before the court in this wrongful death lawsuit are three motions brought pursuant to *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993) ("*Daubert I*").  All Defendants challenge the admissibility of the opinions of Plaintiff Helena Krizek's ("Plaintiff") causation expert, Dr. David Systrom ("Dr. Systrom").  ECF Nos. 249, 250, 251.  For the foregoing reasons, the court GRANTS Defendant DuMouchel's motion, ECF No. 249 in its entirety; and

DENIES in part and GRANTS in part the other Defendants' motions, ECF Nos.

250 & 251.

## II.  <u>BACKGROUND</u>

### A.  **Factual Background**

Dr. Systrom submitted his three-page expert report on January 17,

2020.  ECF No. 249-3.  That report outlines the following timeline of events:

On December 28, 2015, at 3:43 p.m., Bianca Helen Krizek

("Bianca"), Plaintiff's adult daughter, was admitted to Honolulu's Queen's

Medical Center's ("QMC") Emergency Room ("ER") "with a chief complaint of

weakness x3 days, left leg pain, erythematous skin, chills, cough and nausea."  *Id.*

at PageID #2268.  At the time of her admission, Bianca had a history of

alcoholism, cirrhosis, withdrawal seizures, hypokalemia, anorexia, and severe

protein energy malnutrition.  *Id.*  Prior to her arrival at the ER, Emergency Medical

Services ("EMS") had administered one ampule of dextrose without thiamine

(vitamin B1).  *Id.*  At 11:50 p.m., Bianca was assigned to the Medical Intensive

Care Unit ("ICU") with a "presumptive diagnosis of septic shock/severe sepsis due

to cellulitis."  *Id.*  Beginning around 8:00 a.m. on December 29, 2015, Bianca was

recorded as exhibiting periods of confusion, which started escalating over the

hours.  *Id.* at PageID #2269.  She was later given a nasogastric feeding tube.  *Id.*

After she was given sedative drugs, at approximately 8:55 p.m., Bianca was intubated.  *Id.*  Bianca's progress notes "mention Wernicke's encephalopathy in the differential diagnosis," but heart failure and sepsis were ruled out.  *Id.*  Bianca passed away, while still at QMC, on February 5, 2016.  *Id.*

## B.    Dr. David Systrom's Qualifications and Opinions

### 1.    *Dr. Systrom's Qualifications*

Dr. Systrom is a medical doctor in the Pulmonary and Critical Care Medicine Unit at Brigham and Women's Hospital in Boston, Massachusetts. Systrom Curriculum Vitae, ECF No. 249-5 at PageID #2294.  Over the past 30 years, Dr. Systrom "made contributions to clinical research, teaching and clinical care at Massachusetts General Hospital, Brigham and Women's Hospital and Harvard Medical School."  *Id.* at PageID #2310.  His research focuses on "the exercise limit in chronic heart and lung disease, with particular attention paid to interactions between the skeletal muscle mitochondrion and an abnormal pulmonary vasculature."  *Id.*

Dr. Systrom's scholarship is extensive.  He has written approximately 100 peer-reviewed articles, along with various non-peer-reviewed scientific or medical publications.  *See id.* at PageID #2302-09.  Many of these articles center on the topics of pulmonary or respiratory diseases.  *See id.*  He has not written any

3

articles, nor spoken, on Wernicke's encephalopathy or thiamine deficiency. Systrom Dep., ECF No. 285 at PageID #2852-53.[1]

In addition to his research, Dr. Systrom also teaches medical students, residents, and Harvard pulmonary and critical care fellows on consult services and in the ICU. ECF No. 249-5 at PageID #2310. He also teaches various courses on pulmonary physiology. *See id.*

Clinically, Dr. Systrom is currently board certified in internal (1983) and pulmonary medicine (1986). *Id.*; *see also* ECF No. 285 at PageID #2819. He was board certified in critical care medicine (1987), but that certification has lapsed. ECF No. 249-5 at PageID #2309; ECF No. 285 at PageID #2819. He was never board certified in emergency medicine. ECF No. 285 at PageID #2821. For the past nine years, for four to five months out of the year, Dr. Systrom works with patients in the ICU. *Id.* at PageID #2950. He serves as a "consultant" in this capacity, where he "co-manage[s]" the patients. *Id.* He does not serve in an attending capacity. *Id.*

---

[1] The parties individually filed various excerpts of Dr. Systrom's deposition testimony, leaving the testimony spread throughout the record. *See* ECF No. 284. For the convenience of the court, and with the agreement of the parties, the court filed the entire deposition transcript at ECF No. 285. *See id.* The court thus refers to the full deposition transcript at ECF No. 285 in lieu of the various filings made by the parties.

## 2.    *Dr. Systrom's Opinions*

Dr. Systrom's January 17, 2020,[2] letter contains his opinions as to the medical care provided to Bianca.  He rendered these opinions after reviewing Bianca's medical records, including records from the Waikiki Health Clinic in 2013, 2014, and 2015, along with the records pertaining to Bianca's 2015 stay at QMC.  *See* ECF No. 249-3 at PageID #2268; ECF No. 285 at PageID #2826-27.  Based on this review, Dr. Systrom opines that two standards of care were violated.

First, Dr. Systrom opines that Bianca's clinical course "was indicative of Wernicke's encephalopathy," which is "known to occur in malnourished alcoholics" and is "prevented and/or treated by B vitamins."  ECF No. 249-3 at PageID #2269.  Bianca was administered "[o]ngoing intravenous D5 (glucose) . . . during the first 14 hours of admission with less than 100 mg of [intravenous] thiamine [which] led to Wernicke's encephalopathy, increased confusion and ultimately aspiration pneumonia."  *Id.* at PageID #2270.  "Preventive therapy and treatment of patients at risk for thiamine deficiency mandates at least 1500 mg of

---

[2]  To the extent Defendants seek to strike Dr. Systrom's report as untimely, in an exercise of discretion, the court denies this request.  Dr. Systrom's report was submitted 11 days after the deadline for expert disclosures.  Although clearly untimely, Defendants have not shown that they were prejudiced by the late submission of the report.  Thus, the delay was harmless.  *See White v. Sabatino*, 2006 WL 8436460, at *3 (D. Haw. Dec. 27, 2006) (noting that the plaintiff's expert reports were "untimely" but "harmless" and thus declining to impose sanctions but cautioning the plaintiff that "further failures to comply with the applicable  Federal Rules of Civil Procedure and Local Rules may result in sanctions, including the striking of witnesses").

IV thiamine for the first 2 days of hospitalization and *before* any glucose administration.  Standards of care were violated [by] not providing larger doses of IV thiamine[.]"  *Id.*

Second, Dr. Systrom opines that a standard of care was violated because "nausea and vomiting" was not controlled, "gastric residuals" were not checked, and Bianca was not protected from "aspiration pneumonia."  *Id.*

Per Dr. Systrom, the violation of these standards of care led to Bianca's death.  *Id.*

Important to the instant motions, Dr. Systrom's report does not purport to explain how each individual ICU Defendant violated either standard of care.  In other words, he opines that the standards of care were violated without explaining the role each individual physician played in violating that standard.[3]

In a March 9, 2020 deposition, Dr. Systrom further explained his opinions.  In order to diagnose Wernicke's encephalopathy, there is a "clinical and radiographic diagnosis," and the combination of both "can support [the] diagnosis."  *See* ECF No. 285 at PageID #2882.  Dr. Systrom last diagnosed Wernicke's encephalopathy ten years ago.  *Id.* at PageID #2944.  In so doing, he

---

[3]  The sole exception may be Dr. Ariyoshi.  Dr. Systrom's report states that Dr. Ariyoshi "ordered D5 normal saline 1000 mL with 100 mg/day to be administered at 75 ml/h; Multivit's (MVi) were also added to each liter (6 mg of thiamine)."  ECF No. 249-3 at PageID #2268.

reviewed the MRI imaging with the radiologists and combined it with his own clinical findings to arrive at the diagnosis.  *Id.* at PageID #2944-45.  At that time, the patient was in the ICU and not in the ER.  *Id.* at PageID #2865.  In total, Dr. Systrom has treated "probably half a dozen" patients with Wernicke's encephalopathy over the course of thirty years, and his experience with Wernicke's encephalopathy appears to be limited to the ICU setting.  *Id.* at PageID #2864; *see also* Pl.'s Opp'n., ECF No. 252 at PageID #2453 ("Moreover, Dr. Systrom has personal experience with the diagnosis and treatment of Wernicke's encephalopathy in the critical care setting.").

Dr. Systrom's opinion, in part, is based on a chapter discussing Wernicke's encephalopathy in UpToDate, an online medical textbook.  ECF No. 285 at PageID #2864.

## C.   Procedural Background

Plaintiff's Second Amended Complaint ("SAC") names as Defendants: QMC; Dr. Wendy W. Hsu, the Supervising Attending Physician at QMC's ICU; Dr. Hao Chih Ho, the admitting doctor at QMC's ICU; and Dr. T. Scott Gallacher, the Chief Physician at QMC's ICU (collectively, "QMC Defendants").  ECF No. 190 at PageID #1536-37.  She also names the Hawaii Residency Program ("HRP"), and Drs. Nobuhiro Ariyoshi and Ittikorn Spanuchart,

who were the resident physicians assigned to the ICU (collectively "HRP Defendants"). *See id.* Lastly, she names Dr. Matthew C. DuMouchel, the ER physician charged with Bianca's care during her time in the ER. *Id.* at PageID #1536.

On February 5, 2020, QMC Defendants filed a motion for summary judgment. ECF No. 205. HRP Defendants and Dr. DuMouchel joined in the motion. ECF Nos. 209, 212.

During a May 8, 2020 status conference, the court determined that these motions "raised arguments pertaining to the qualification of Plaintiff's causation expert and the admissibility of his opinions" but they failed to "properly bring forth a motion pursuant to *Daubert*"; instead, Defendants "raise[d] arguments on admissibility in a joinder and/or replies." *See* ECF Nos. 240 & 243. With agreement of the parties, the court then set a briefing schedule for Defendants to file *Daubert* motions. *See* ECF No. 243.

On June 15, 2020, Defendant DuMouchel, the QMC Defendants, and the HRP Defendants filed separate *Daubert* motions. ECF Nos. 249, 250 & 251. Plaintiff filed her opposition to Dr. DuMouchel's motion, ECF No. 252, and a single opposition to the motion filed by QMC Defendants and HRP Defendants,

ECF No. 253.  Defendants filed their replies on July 10, 2020.  ECF Nos. 260, 261 & 262.

On August 26, 2020, the court held an evidentiary hearing by video. ECF No. 277.  Dr. Systrom was the only witness.

### III.  <u>STANDARD OF REVIEW</u>

Federal Rule of Evidence 702 states:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

The court has the responsibility of acting as a gatekeeper to prevent unreliable expert testimony from reaching the jury.  *Daubert I*, 509 U.S. at 589.  In carrying out this responsibility, the court has discretion and flexibility in determining what evidence is relevant, reliable, and helpful to the trier of fact. *Cabrera v. Cordis Corp*., 134 F.3d 1418, 1420 (9th Cir. 1998); *United States v. Rincon*, 28 F.3d 921, 926 (9th Cir. 1994) ("District courts must strike the

appropriate balance between admitting reliable, helpful expert testimony and excluding misleading or confusing testimony to achieve the flexible approach outlined in *Daubert*.").

The court must determine if the expert is qualified by "knowledge, skill, experience, training, or education" to render an expert opinion.  That is, "the trial court is required to determine whether a proposed expert is qualified to give expert testimony" in the relevant field.  *Whisnant v. United States*, 2006 WL 2927732, at *2 (W.D. Wash. Oct. 11, 2006); *see also Higgins v. Koch Dev. Corp.*, 794 F.3d 697, 704 (7th Cir. 2015) (stating, in part, that to gauge reliability, the district court must determine if the expert is qualified in the relevant field).

The Ninth Circuit has articulated a two-prong analysis for admissibility. First, the proffered testimony must be reliable, i.e., the expert's testimony reflects scientific knowledge, the findings are derived by the scientific method, and the work product amounts to "good science."  *Daubert v. Merrell Dow Pharm.*, 43 F.3d 1311, 1315 (9th Cir. 1995) ("*Daubert II*") (citation and quotation signals omitted).  Second, the testimony must meet the "fit" requirement, i.e., "it logically advances a material aspect of the proposing party's case."  *Id*.

For the reliability inquiry, the focus is on the expert's "principles and methodology, not on the conclusions that they generate."  *Daubert I*, 509 U.S. at

595.  "Scientific evidence is deemed reliable if the principles and methodology used by an expert are grounded in the methods of science." *Clausen v. M/V New Carissa*, 339 F.3d 1049, 1056 (9th Cir. 2003); *see also Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1232 (9th Cir. 2017).  Accordingly, the expert's methods must be adequately explained.  *United States v. Hermanek*, 289 F.3d 1076, 1094 (9th Cir. 2002); *see also Daubert II*, 43 F.3d at 1319 (holding that the expert must "explain the methodology . . . followed to reach [his or her] conclusions"); *Rincon*, 28 F.3d at 924 (explaining that the methods used by the expert must be described "in sufficient detail" such that the district court can determine if they are reliable).  "For scientific opinion, the court must assess the reasoning or methodology, using as appropriate such criteria as testability, publication in peer reviewed literature, and general acceptance, but the inquiry is a flexible one.  Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010) (footnotes omitted); *see also Murray v. S. Route Mar. SA*, 870 F.3d 915, 925 (9th Cir. 2017).[4]

---

[4] The Supreme Court has listed non-exclusive factors to consider when determining whether to admit expert testimony under Rule 702.  *See Daubert I*, 509 U.S. at 593-95.  These include: "whether the theory or technique employed by the expert is generally accepted in the scientific community; whether it's been subjected to peer review and publication; whether it can

For the "fit" inquiry, the focus is "primarily" on "relevance." *Daubert I*, 509 U.S. at 591. But this inquiry is not merely a reiteration of the relevancy inquiry—"[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses." *Id*. at 595 (citation and quotation signals omitted). "Federal judges must therefore exclude proffered scientific evidence under Rules 702 and 403 unless they are convinced that [the evidence] speaks clearly and directly to an issue in dispute in the case, and that it will not mislead the jury." *Daubert II*, 43 F.3d at 1321 n.17. And to be admissible "the subject matter at issue must be beyond the common knowledge of the average layman." *United States v. Finley*, 301 F.3d 1000, 1007 (9th Cir. 2002); *United States v. Hanna*, 293 F.3d 1080, 1086 (9th Cir. 2002).

---

be and has been tested; and whether the known or potential rate of error is acceptable." *Daubert II*, 43 F.3d at 1316. These factors are illustrative only, may not apply in every case, and are to be used flexibly. *Wendell*, 858 F.3d at 1232.

## IV.  **DISCUSSION**

**A.    Hawaii State Law Requirements**

Although the admissibility of expert testimony is governed by the federal rules of evidence, the evidence necessary to prove causation in a medical malpractice action is controlled by state law.  And to establish negligence under Hawaii law in a medical malpractice action, expert testimony is necessary to establish the standard of care and legal causation to a "reasonable medical probability."  *Estate of Frey v. Mastroianni*, 146 Haw. 540, 557, 463 P.3d 1197, 1214 (2020); *Kahoʻohanohano v. Dep't of Human Servs.*, 117 Haw. 262, 296, 178 P.3d 538, 572 (2008) (citing *Exotics Hawaii-Kona, Inc. v. E.I. Du Pont De Nemours & Co.*, 116 Haw. 277, 300, 172 P.3d 1021, 1044 (2007)); *Barbee v. Queen's Med. Ctr.*, 119 Haw. 136, 163, 194 P.3d 1098, 1125 (Haw. App. 2008); *Craft v. Peebles*, 78 Haw. 287, 305, 893 P.2d 138, 156 (1995).

**B.    Dr. Systrom Will not be Permitted to Testify as to the Standard of Care Applicable to Dr. DuMouchel, an ER Physician**

Dr. DuMouchel's primary argument is quite simple—Dr. Systrom is not qualified to opine on the standard of care as it relates to the prevention of

Wernicke's encephalopathy in the practice of emergency medicine.[5]  *See* ECF No. 249-1 at PageID #2250, 2252-53.  The court agrees that Plaintiff has failed to show that Dr. Systrom has the requisite knowledge, skill, experience, training, or education to testify in this area.

The court fully recognizes that Rule 702 "contemplates a broad conception of expert qualifications," *Thomas v. Newton Int'l Enters.*, 42 F.3d 1266, 1269 (9th Cir. 1994), and that an expert need not have official credentials in the relevant subject matter to meet Rule 702's requirements.  *See United States v. Garcia*, 7 F.3d 885, 889-90 (9th Cir. 1993); *United States v. Smith*, 520 F.3d 1097, 1105 (9th Cir. 2008), *aff'd en banc*, 561 F.3d 934 (9th Cir. 2009).  In fact, "courts often find that a physician in general practice is competent to testify about problems that a medical specialist typically treats."  *Gayton v. McCoy*, 593 F.3d 610, 617 (7th Cir. 2010).

But it is equally true that the mere fact of being a physician in one specialty does not by itself qualify that physician as an expert in another.  Instead, in exercising the gatekeeping function courts must ask whether an expert is

---

[5]  The exact description of this standard of care has been stated differently by the parties in various parts of the record.  *See, e.g.*, ECF No. 252 at PageID # 2452; ECF No. 285 at PageID #2861-62.  For ease of reference, the court will refer to this standard of care in general terms as the prevention of Wernicke's encephalopathy in the practice of emergency medicine (that is, in the ER) or critical care medicine (that is, in the ICU).

qualified to provide a specific opinion—"we must look at each of the conclusions [the expert] draws individually to see if he has the adequate education, skill, and training to reach them." *Id.*  Applying this rule, the court determines that: 1) Dr. Systrom does not have the Rule 702 credentials to testify as an expert in the prevention of Wernicke's encephalopathy in the practice of emergency medicine; and 2) Dr. Systrom's expertise in the treatment of Wernicke's encephalopathy in critical care medicine does not, by itself, qualify him as an expert in the prevention of Wernicke's encephalopathy in the practice of emergency medicine.

Here, Plaintiff has not shown that Dr. Systrom has the knowledge, skill, experience, training, or education to testify as an expert in the area of the prevention of Wernicke's encephalopathy in the practice of emergency medicine.[6] Dr. Systrom has worked *with* ER physicians and within the ER—but only in his capacity as an ICU physician.[7]  *See* ECF No. 285 at PageID #2847 (noting that he "ha[s] a dialogue with the ER team and we come up with a plan together"); *id.* at PageID #2849-50 (noting that he is called into the ER if the patient may have

---

[6] "Emergency room medicine is considered its own medical specialty." *Cleveland ex rel. Cleveland v. United States*, 457 F.3d 397, 405 (5th Cir. 2006).  And unlike a physician in the ICU, an ER physician must "evaluate the patient within a short time after [their] arrival" and "evaluate a patient . . . for immediate threats to life, limb, or bodily function."  ECF No. 249-7 at PageID #2320-21.

[7] Dr. Systrom worked as an ER physician after he completed his medical residency in 1982 or 1983, but not since that time.  ECF No. 285 at PageID #2820.

pulmonary conditions).  He does not practice emergency medicine (and, of course, is not certified in emergency medicine; has not published in emergency medicine; and does not teach in emergency medicine.  And, perhaps most importantly, Dr. Systrom has no experience in the prevention or treatment of Wernicke's encephalopathy in an emergency room setting.

The mere fact that Dr. Systrom has worked alongside ER physicians in general (in his capacity as an ICU physician consultant) is insufficient for him to meet the requirements of Rule 702.  In short, given his lack of actual expertise in emergency medicine, let alone experience related to the prevention and/or treatment of Wernicke's encephalopathy, the court concludes that Dr. Systrom lacks the qualifications to testify as an expert on the prevention of Wernicke's encephalopathy in emergency medicine.

Plaintiff attempts to overcome this shortfall by arguing that the need to administer thiamine to prevent Wernicke's encephalopathy is taught to every medical student and should be known to all medical professionals.  ECF No. 252 at PageID #2452-53.  But even assuming the general truth of this statement, Plaintiff has not established that Dr. Systrom is qualified to testify how this general knowledge applies to a standard of care in a particular specialty—emergency medicine.  How an ER physician diagnoses the possibility of Wernicke's

encephalopathy in the context of triaging for immediate threats certainly may differ from how an ICU physician would engage in that diagnosis.  Further, again accepting Dr. Systrom's statement as true, the logical extension would be to permit any recent graduate from medical school to testify as to the standard of care in any medical specialty, provided the matter at issue is taught in medical school.  That is simply a bridge too far—not every medical school graduate is qualified in *emergency medicine* by knowledge, skill, experience, training, or education.

Further, being an expert in pulmonary and critical care medicine does not, by itself, qualify Dr. Systrom to testify as an expert as it relates to Wernicke's encephalopathy in emergency medicine.  To find that an expert in one specialty (based on that expertise alone) is qualified to opine as an expert in another specialty would require, at a minimum, the proponent of that testimony to show sufficient similarity between the specialties and the standards of care.  *See e.g., Cleveland ex rel. Cleveland,* 457 F.3d at 405-06 (rejecting argument that an internist's opinion of an ER physician's standard of care "is not unique to the emergency room setting" because the internist "never stated that the standard of care for diagnosing congestive heart failure in the emergency room setting is identical to its diagnosis in the field of internal medicine"); *Lattimore v. Dickey*, 239 Cal. App. 4th 959, 968 (2015) ("[W]here a medical specialist is alleged to

have acted negligently, the 'specialist must possess and use the learning, care and skill normally possessed and exercised by practitioners of that specialty under the same or similar circumstances.'" (citation omitted)); *Knox v. Bozorgi*, 2017 WL 5075828, at *2 (W.D. Penn. Feb. 1, 2017) (limiting internal medicine doctor's testimony "to the standard of care for internal physicians" and precluding opinions of any breaches of standards of care as to an emergency room doctor and radiologist); *Bonds v. Nesbitt*, 322 Ga. App. 852, 859 (2013) (affirming exclusion of pulmonary and critical care physician from testifying to an ER medicine standard of care "on the grounds that [the proffered expert] is not sufficiently familiar with the standard of care at issue and does not have specific experience in the relevant practice area."); *Carter v. United States*, 2017 WL 6460864, at *2 (W.D. La. Dec. 15, 2017).

In short, Plaintiff has not established that the standards of care that apply to an ICU physician are sufficiently similar to the standards of care in the prevention of Wernicke's encephalopathy in the practice of emergency medicine. Thus, Dr. DuMouchel's motion is GRANTED to the extent the court will not permit Dr. Systrom to opine as to the standard of care for emergency medicine related to the diagnoses and prevention of Wernicke's encephalopathy.

**C.   Dr. Systrom Will be Permitted to Testify as to the Standard of Care Applicable to ICU Physicians**

Dr. Systrom is qualified to provide his standard of care opinion as to the QMC and HRP Defendants—all ICU Physicians.  HRP and QMC Defendants have not established how an ICU *consultant's* standard of care would differ from that of an ICU attending or resident physician.  Accordingly, QMC and HRP Defendants' motions are DENIED to the extent they argue that Dr. Systrom, an ICU physician *consultant,* cannot offer a standard of care opinions as to the ICU physician Defendants.

**D.   Dr. Systrom's Opinions are Sufficiently Reliable Under *Daubert***

As stated above, although Dr. Systrom opines that two standards of care were violated in the ICU, he never attempts to tether his opinions as to a breach of the standard of care to each individual ICU physician (other than a single mention of Dr. Ariyoshi).  The QMC and HRP Defendants now argue that this lack of specificity renders Dr. Systrom's standard of care opinions unreliable, lacking in scientific methodology, and would lead to jury confusion.  The court disagrees.

Defendants have cited no caselaw that requires an expert to tether a violation of a standard of care to a particular physician.  Stated differently, under Rule 702 an expert meeting the *Daubert* standards can certainly testify as to the

existence or non-existence of a standard of care. Nothing requires that expert *also* to opine that a particular physician violated that standard of care.

The QMC and HRP Defendants argue that, under Hawaii law, Plaintiff is required to offer expert testimony as to 1) what each Defendant's standard of care is; 2) whether each Defendant breached that standard of care; and 3) how the breach caused injury. Indeed, under Hawaii law, expert testimony is required. *See e.g.,* Hawaii Civil Jury Instructions, Instruction 14.3: Expert Testimony Required, available at https://www.courts.state.hi.us/docs/legal_references/jury_instructions _civil.pdf (last visited Sept. 17, 2020). But, again, Defendants cite no law that suggests an expert, and only an expert, can provide evidence that a particular Defendant violated a standard of care. Dr. Systrom can provide evidence as to an appropriate standard of care, but Plaintiff will still be required at trial to show that a particular Defendant violated that standard. But whether or not evidence connects a particular Defendant to a breach of the standard is not necessarily part of the Rule 702 analysis; instead, it is more appropriate to address the issue in a motion for summary judgment[8] or at trial.

_____

[8] The court is aware that the QMC and HRP Defendants raised similar arguments in their initial motions for summary judgment. But, in the court's view, the admissibility of Dr.

Finally, the court does not find Dr. Systrom's two standard of care opinions as to the QMC and HRP Defendants to be confusing or speculative. As discussed below, Dr. Systrom will be limited to opining as to the appropriate standard of care by ICU physicians—opinions that he is qualified to provide. Accordingly, Dr. Systrom's two standard of care opinions, as to the ICU physicians, are admissible under Rule 702.[9]

## E.    Dr. Systrom's Opinions are Limited to his Expert Report

The QMC and HRP Defendants also move to limit Dr. Systrom's opinions to his expert report, to the extent Dr. Systrom's deposition and/or

---

Systrom's opinion must be determined under Rule 702 before the court can construe that evidence in the light most favorable to the non-movants at summary judgment. To be clear, this order is limited to ruling on the admissibility of Dr. Systrom's opinions under Rule 702. That is, the court is not deciding here if there is or is not sufficient evidence to support Plaintiff's claim that any individual ICU physician violated the standard of care as opined by Dr. Systrom.

[9]  Additional arguments the QMC Defendants make as to the reliability of Dr. Systrom's opinions also fail. Specifically, they argue Dr. Systrom's opinions are unreliable because 1) Dr. Systrom failed to follow his own methodology of reading the physicians' depositions when reaching his standard of care opinions, ECF No. 251-1 at PageID #2372-74; 2) Dr. Systrom failed to follow his own methodology when diagnosing Wernicke's encephalopathy by failing to personally review the MRI images, *id.* at PageID #2374; and 3) Dr. Systrom's aspiration opinion is unreliable because the record does not indicate that Bianca had any gastric content, *id.* at PageID #2375.

But these arguments do not impact the reliability of Dr. Systrom's opinions. That is, failing to read the physicians' depositions has no bearing on *what* standards of care were breached given Bianca's medical records (even if he did not specifically identify *who* breached the standards); Dr. Systrom testified that he still reviewed the MRI technician's summary of the MRI images; and his aspiration opinion is not necessarily tied only to gastric content. In short, these arguments address the weight of Dr. Systrom's opinion, not its admissibility. Further, the court rejects the argument that Dr. Systrom's opinion testimony should be precluded pursuant to Federal Rule of Evidence 403.

testimony may attempt to improperly offer new opinions.  During the August 26, 2020 hearing, Plaintiff agreed that Dr. Systrom should be limited to the opinions offered in his expert report.

Federal Rule of Civil Procedure 26(a)(2)(A) requires that "a party must disclose to the other parties the identity of any witness it may use at trial to present [expert testimony]."  "[T]his disclosure must be accompanied by a written report—prepared and signed by the witness—if the witness is one retained or specially employed to provide expert testimony in the case . . . .  The report must contain . . . a complete statement of all opinions the witness will express and the basis and reasons for them," among other things.  Fed. R. Civ. P. 26(a)(2)(B)(i).  "With that said, however, the rule 'does not limit an expert's testimony simply to reading his report . . . .  The rule contemplates that the expert will supplement, elaborate upon, and explain . . . his report' in his oral testimony."  *Durham v. Cty. of Maui*, 2011 WL 2532423, at *7 (D. Haw. June 23, 2011) (quoting *Muldrow ex rel. Estate of Muldrow v. Re-Direct, Inc.*, 493 F.3d 160, 167 (D.C. Cir. 2007)) (second citation and brackets omitted).

After an expert report has been provided, the Federal Rules of Civil Procedure require a party to supplement, but this "duty to supplement *does not* provide the opportunity to *add information* that should have been initially provided

22

under Rule 26(a).  Rather, '[s]upplementation under the Rules means correcting

inaccuracies, or filling the interstices of an incomplete report based on information

that was not available at the time of the initial disclosure.'"  *Id.* (quoting *Keener v.*

*United States*, 181 F.R.D. 639, 640 (D. Mont. 1998) (emphasis added)).  "A party

may not rely on [the duty to supplement] as a way to remedy a deficient expert

report or as a means of getting in, in effect, a brand new report."  *Broadband iTV,*

*Inc. v. Haw. Telecom, Inc.*, 2015 WL 12792325, at *1 (D. Haw. Aug. 14, 2015)

(quoting *Medtronic Vascular, Inc. v. Abbott Cardiovascular Sys.*, 2008 WL

4601038, at *1 (N.D. Cal. Oct. 15, 2008)).  Thus, an expert may "expand or

explain information contained in his or her report during oral testimony, [but] the

expert cannot testify as to new opinions not contained in the expert report."

*Hambrook v. Smith*, 2016 WL 4084110, *3 (D. Haw. Aug 1, 2016) (citations

omitted).[10]

> Here, Dr. Systrom's expert report is limited to offering two standard

of care opinions that were breached by the ICU physicians providing treatment to

Bianca.  *See* ECF No. 249-3 at PageID #2269-70.  As discussed in detail above, the

report does not contain any opinions as to *how* each individual ICU physician

---

[10]  To be clear, this Order does not address whether Dr. Systrom's deposition testimony falls within or outside the permissible bounds of supplementation.

violated those standards of care (again, with the possible exception being Dr. Ariyoshi). Thus, for example, any opinions as to specific actions taken or not taken by the QMC and HRP Defendants in violation of the standards of care would be beyond Dr. Systrom's expert report and would constitute a new opinion. *See Hambrook*, 2016 WL 4084110, at *3 (noting that an expert could not discuss the connection between a condition of an enlarged heart and the risk of death, because the report failed to provide any discussion of such connection despite referencing decedent's condition of an enlarged heart). Accordingly, the QMC and HRP Defendants' motions are GRANTED to the extent they seek to limit Dr. Systrom's testimony to the opinions contained in his report.

///

///

///

///

///

///

///

///

///

# V.  **CONCLUSION**

For the foregoing reasons, the court GRANTS Defendant

DuMouchel's motion in full, ECF No. 249, and DENIES in part and GRANTS in

part the HRP and QMC Defendants' motions, ECF Nos. 250 & 251.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, September 21, 2020.



/s/ J. Michael Seabright
J. Michael Seabright
Chief United States District Judge

*Krizek v. The Queen's Med. Ctr., et al.*, Civ No. 18-00293 JMS-WRP, Order: 1) Granting Defendant DuMouchel's *Daubert* Motion, ECF No. 249; and 2) Denying in Part and Granting in Part Other Defendants' *Daubert* Motions, ECF Nos. 250 & 251