IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| HELENA KRIZEK, Birth Mother of BIANCA HELEN KRIZEK (DECEDENT),<br><br>            Plaintiff,<br><br>vs.<br><br>QUEENS MEDICAL CENTER; HAWAII RESIDENCY PROGRAM; DR. NOBUHIRO ARIYOSHI; DR. ITTIKORN SPANUCHART; DR. WENDY W. HSU; and DR. HAO CHIH HO,<br><br>            Defendants. | CIV. NO. 18-00293 JMS-WRP<br><br>ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS THE QUEEN'S MEDICAL CENTER, WENDY W. HSU, M.D., AND HAO CHIH HO M.D.'S MOTION FOR SUMMARY JUDGMENT, ECF NO. 310. |

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS THE QUEEN'S MEDICAL CENTER, WENDY W. HSU, M.D., AND HAO CHIH HO M.D.'S MOTION FOR SUMMARY JUDGMENT, ECF NO. 310.

## I. <u>INTRODUCTION</u>

Before the court is a Motion for Summary Judgment brought by The

Queen's Medical Center ("QMC"), Wendy W. Hsu, M.D., and Hao Chih Ho, M.D.

(collectively the "QMC Defendants"). ECF No. 310. Plaintiff Helena Krizek

("Plaintiff") initiated this wrongful death lawsuit following the death of her adult

daughter, Bianca Krizek ("Bianca"), while Bianca was hospitalized at QMC. The

QMC Defendants contend they are entitled to summary judgment because Plaintiff

does not have sufficient admissible evidence to establish any purported negligence as to each QMC Defendant.  For the foregoing reasons, the court GRANTS in part and DENIES in part QMC Defendants' Motion for Summary Judgment.

## II.  <u>BACKGROUND</u>

### A.    Factual Background[1]

On December 28, 2015, at 3:43 p.m., Bianca was admitted to QMC's Emergency Room ("ER") "with a chief complaint of weakness x3 days, left leg pain, erythematous skin, chills, cough and nausea."  Dr. David Systrom's Report, ECF No. 311-4 at PageID # 3404.  Bianca had a history of several medical conditions, including alcoholism, cirrhosis, withdrawal seizures, hypokalemia, anorexia, severe protein energy malnutrition, and cellulitis.  *Id.*  At 11:50 p.m., Bianca was assigned to the Medical Intensive Care Unit ("ICU") with a "presumptive diagnosis of septic shock/severe sepsis due to cellulitis."  *Id.* Beginning around 8:00 a.m. on December 29, 2015, Bianca was recorded as exhibiting periods of confusion, which escalated throughout the day.  *Id.* at PageID # 3405.  She was later given a nasogastric feeding tube.  *Id.*  At approximately 8:55

---

[1]  At this summary judgment stage, the court sets forth the factual background construing the evidence in the light most favorable to Plaintiff where materially disputed.  *See, e.g.*, *S.R. Nehad v. Browder*, 929 F.3d 1125, 1132 (9th Cir. 2019) (reiterating that, at summary judgment, courts "view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor") (citation omitted).

p.m., Bianca was sedated and intubated.  *Id.*  She was then given a chest x-ray,
which revealed "new airspace disease consistent with aspiration pneumonia."  *Id.*
Bianca continued to decline over the next few weeks, losing renal function and
brainstem reflexes.  *Id.*  She suffered cardiac arrest and passed away on February 5,
2016, while still at QMC.  *Id.*

   Bianca's care team included a number of QMC doctors and nurses, as
well as two resident physicians, Drs. Ariyoshi and Spanuchart.  The residents were
enrolled at the University of Hawaii John A. Burns School of Medicine (the
"University") and employed by the Hawaii Residency Programs, Inc. ("HRP"), a
non-profit corporation affiliated with the University.  *See* ECF No. 322-6 at
PageID # 3605.  The residents were on rotation at QMC as part of a joint training
program established by QMC and the University pursuant to a 2011 Letter of
Agreement and a 2014 Affiliation Agreement.  ECF No. 322-3; ECF No. 322-5.
Among other things, the Agreements delineate the responsibilities of the
University, QMC, and HRP with respect to residents participating in the program.
Per the Agreements, HRP employs the residents and provides them with financial
support, health benefits, and medical malpractice insurance.  ECF No. 322-3 at
PageID ## 3545-46.  The University, meanwhile, retains "authority for the
oversight, conduct, and direction of the resident education programs within

[QMC]." ECF No. 322-5 at PageID # 3596. And QMC is "responsible for providing appropriate teaching of the resident(s) along with the adequate supervision of the resident(s) during the course of their educational training." ECF No. 322-3 at PageID # 3546.

**B.     Plaintiff's Medical Expert Dr. David Systrom's Opinions**

Plaintiff's expert, Dr. David Systrom ("Dr. Systrom") opines that two standards of care were violated in the patient care of Bianca.

First, Dr. Systrom opines that Bianca suffered from undiagnosed Wernicke's encephalopathy. ECF No. 311-4 at PageID # 3405.[2] Specifically, he opines that failure to administer thiamine prior to administering glucose "led to Wernicke's encephalopathy, increased confusion and ultimately aspiration pneumonia." *Id.* at PageID # 3406. "A secondary violation of a standard of care was failing to control nausea and vomiting . . . , check gastric residuals and protect the patient from aspiration pneumonia in a confused patient unable to protect her upper airway." *Id.* According to Dr. Systrom, "[t]he development of Wernicke's

_____

[2] In fact, Dr. Systrom opines that Bianca suffered from "Wernicke's encephalopathy, Marchiafava disease, or both." *Id.* Over the course of the litigation, however, the parties appear to have focused on whether Bianca developed Wernicke's encephalopathy. Regardless, both Wernicke's encephalopathy and Marchiafava disease are neurological conditions caused by depletion of B-vitamin reserves. *See* https://www.mayoclinicproceedings.org/article/S0025-6196(19)30255-1/fulltext; https://www.ncbi.nlm.nih.gov/books/NBK526007/. And both are "known to occur in malnourished alcoholics and both are prevented and/or treated by B vitamins." ECF No. 311-4 at PageID # 3405.

encephalopathy, agitation and confusion, nausea and vomiting with an inability to protect the airway" led to Bianca's death.  *Id.*

## C.    Procedural History

On December 20, 2019, Plaintiff filed her Second Amended Complaint ("SAC") asserting a wrongful death lawsuit on behalf of her daughter, Bianca Krizek.  ECF No. 190.  Plaintiff names as Defendants QMC; Dr. Wendy W. Hsu, the Supervising Attending Physician at QMC; and Dr. Hao Chih Ho, the admitting doctor at QMC's ICU (the "QMC Defendants").[3]  *Id.* at PageID ## 1534, 1536-37.  Plaintiff also names as Defendants HRP and the resident physicians, Nobuhiro Ariyoshi, M.D. and Ittikorn Spanuchart, M.D. (the "HRP Defendants"). *Id.*

Plaintiff alleges the following claims: (1) negligence against all Defendants, *id.* at PageID # 1561; (2) gross negligence for failure to adequately supervise against the QMC Defendants, *id.* at PageID # 1562; (3) negligence against QMC and HRP for failure to implement proper procedures and identify

---

[3]  Prior to filing the SAC, Plaintiff also named the coroner, Dr. Christopher Happy, M.D. as a Defendant.  On November 22, 2019, the claims against Dr. Happy were dismissed pursuant to a motion to dismiss.  *See* ECF No. 187.  The SAC also named Dr. T. Scott Gallacher, the Chief Physician at QMC's ICU and Dr. Matthew Dumouchel, the emergency room physician. On October 5, 2020, the parties entered into a stipulation for dismissal with prejudice of all claims against Dr. Dumouchel.  ECF No. 293.  And on February 3, 2021, the parties entered into a stipulation for dismissal with prejudice of all claims against Dr. Gallacher.  ECF No. 307.

proper standards of care, *id.*; and (4) gross negligence for wrongful death against all Defendants, *id.* at PageID #1564.

On September 21, 2020, the court issued a *Daubert* order as to the admissibility of Dr. Systrom's testimony.  *See* ECF No. 289 ("*Daubert* Order"). Among other things, the court found that Dr. Systrom, an ICU physician, was qualified to proffer testimony as to the ICU physicians in the case—namely the remaining QMC Defendants and HRP Defendants.

The court limited Dr. Systrom's testimony to two standard of care opinions: (1) failure to provide thiamine prior to the administration of glucose; and (2) failure to protect Bianca from "aspiration pneumonia" by failing to control her "nausea and vomiting," or check her "gastric residuals."  *Id.* at PageID ## 3005-06, 3019, 3023-24 (*Daubert* Order summarizing the standard of care opinions).

In its *Daubert* Order, the court also rejected an argument made by the QMC Defendants and HRP Defendants that Dr. Systrom's testimony was inadequate because he failed to explain how *each* Defendant individually violated an applicable standard of care.  *Id.* at PageID ## 3020-21.  The court explained that:

> Dr. Systrom can provide evidence as to an appropriate standard of care, but Plaintiff will still be required at trial

6

to show that a particular Defendant violated that
standard.

*Id.* at PageID # 3020.

On February 10, 2021, the QMC Defendants and HRP Defendants
filed Motions for Summary Judgment.  ECF No. 308 (HRP Defendants' Motion);
ECF No. 310 (QMC Defendants' Motion).  The Motions, in large part, reasserted
the argument that Dr. Systrom's standard-of-care opinions are legally insufficient
because they failed to identify how each Defendant violated a standard of care.
*See generally* ECF Nos. 308, 310.  The QMC Defendants' Motion raised additional
arguments related to negligent supervision, vicarious liability, and damages.

On February 23, 2021, the court denied the HRP Defendants' Motion
in its entirety, and the QMC Defendants' Motion in part because their arguments
regarding Dr. Systrom's opinions had already been rejected in the *Daubert* Order.
*See* ECF No. 316.  The court did not address the remaining arguments raised in the
QMC Defendants' Motion.  *Id.*

On March 29, 2021, both Plaintiff and the HRP Defendants filed
responses to the remaining aspects of QMC Defendants' Motion for Summary
Judgment.  ECF Nos. 321, 323.  On April 5, 2021, QMC Defendants filed their
Reply.  ECF No. 326.  The court held a hearing on April 19, 2021.  ECF No. 329.

### III.  <u>STANDARD OF REVIEW</u>

Summary judgment is proper where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also, e.g., Sandoval v. Cnty. of San Diego*, 985 F.3d 657, 665 (9th Cir. 2021).  Rule 56(a) mandates summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1103 (9th Cir. 2000).

"The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery and affidavits which demonstrate the absence of a genuine issue of material fact."  *Olivier v. Baca*, 913 F.3d 852, 857 (9th Cir. 2019) (citing *Celotex*, 477 U.S. at 323).  Where, as here, the moving party does not have the ultimate burden of persuasion at trial, they bear both the initial burden of production and the ultimate burden of persuasion on their motion for summary judgment.  *Friedman v. Live Nation Merch., Inc.*, 833 F.3d 1180, 1188 (9th Cir. 2016) (citing *Nissan Fire*, 210 F.3d at 1102).  "'[W]hen the moving party has carried its burden under Rule 56[(a)] its opponent must do more than simply show that there is some metaphysical doubt as to the material facts,'"

but must come forward with specific facts showing that there is a genuine dispute for trial. *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). "[A]t least some significant probative evidence" must be produced. *Hexcel Corp. v. Ineos Polymers, Inc.*, 681 F.3d 1055, 1063 (9th Cir. 2012) (internal citation and quotation omitted). "'If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.'" *United States ex rel. Kelly v. Serco, Inc.*, 846 F.3d 325, 329-30 (9th Cir. 2017) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986)); *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000) ("A scintilla of evidence or evidence that is merely colorable or not significantly probative does not present a genuine issue of material fact."); *see also Friedman*, 833 F.3d at 1185 (citing *McIndoe v. Huntington Ingalls Inc.*, 817 F.3d 1170, 1173 (9th Cir. 2016)).

For purposes of Rule 56(a), a dispute is genuine only if there is a sufficient evidentiary basis on which "a reasonable jury could return a verdict for the nonmoving party," and a dispute of a fact is material only if it could affect the outcome of the suit under the governing law. *Momox-Caselis v. Donohue*, 987 F.3d 835, 841 (9th Cir. 2021) (citing *Anderson*, 477 U.S. at 248). When considering the evidence on a motion for summary judgment, the court must draw

all reasonable inferences in the light most favorable to the nonmoving party.

*Rookaird v. BNSF Ry. Co.*, 908 F.3d 451, 459 (9th Cir. 2018).

## IV.  <u>DISCUSSION</u>

The QMC Defendants move for summary judgment as to each of

Plaintiff's four negligence claims.  In this diversity action, the court applies Hawaii

law, the substantive law of the forum state.  *See Erie R.R. Co. v. Tompkins*, 304

U.S. 64 (1938).

To prevail on a negligence claim under Hawaii law, a plaintiff must

show by a preponderance of the evidence:

> (1) A duty, or obligation, recognized by the law,
> requiring the defendant to conform to a certain standard
> of conduct, for the protection of others [including the
> plaintiff] against unreasonable risks;
> (2) A failure on the defendant's part to conform to the
> standard required: a breach of the duty;
> (3) A reasonably close causal connection between the
> conduct and the resulting injury [to the plaintiff][;] and
> (4) Actual loss or damage resulting to the interests of [the
> plaintiff].

*Takayama v. Kaiser Found. Hosp.*, 82 Haw. 486, 498-99, 923 P.2d 903, 915-16

(1996) (quoting *Knodle v. Waikiki Gateway Hotel, Inc.*, 69 Haw. 376, 385, 742

P.2d 377, 383 (1987)).  Applying this standard, the court considers the QMC

Defendants' arguments as to each of Plaintiff's negligence claims in turn.

**A.     Counts I and IV: Direct Negligence Claims against QMC Defendants**

The QMC Defendants first move for summary judgment as to Plaintiff's direct negligence claims against them: Count I (wrongful death negligence against all QMC Defendants) and Count IV (gross negligence against all QMC Defendants).  The QMC Defendants argue that they are entitled to summary judgment as to these claims because: (1) Dr. Systrom's two standard-of-care opinions do not identify how each individual Defendant violated a standard of care; (2) Dr. Systrom's opinions that violations of the standard of care led to Bianca's alleged aspiration are baseless because the nurse overseeing Bianca's care did not observe Bianca aspirate; and (3) "theories of liability" unrelated to Dr. Systrom's two standard-of-care opinions should be dismissed.  *See* ECF No. 310-1.

**1.     *Plaintiff's Allegations Related to Dr. Systrom's Testimony***

To prove negligence in a medical malpractice action under Hawaii law, expert testimony is necessary to establish both the applicable standard of care and legal causation to a "reasonable medical probability."  *Est. of Frey v. Mastroianni*, 146 Haw. 540, 557, 463 P.3d 1197, 1214 (2020) (internal quotation and citation omitted); *Kahoʻohanohano v. Dep't of Hum. Servs.*, 117 Haw. 262, 296, 178 P.3d 538, 572 (2008) (citing *Exotics Hawaii-Kona, Inc. v. E.I. Du Pont*

*De Nemours & Co.*, 116 Haw. 277, 300, 172 P.3d 1021, 1044 (2007)); *Craft v. Peebles*, 78 Haw. 287, 305, 893 P.2d 138, 156 (1995).

Here, QMC Defendants once again raise the argument—already twice rejected by the court—that Dr. Systrom fails to tie his specific standard of care opinions to the individual Defendants.[4]  ECF No. 289 at PageID # 3020.  The court will not reconsider the same argument for a third time.  *See* ECF No. 316.  This argument provides no support for the QMC Defendant's Motion for Summary Judgment as to Counts I and IV.

### 2. *Dr. Systrom's Opinion that Bianca Suffered from "Aspiration Pneumonia"*

Dr. Systrom opines, in part, that two standards of care were violated, resulting in Bianca's confusion, "aspiration pneumonia," and, ultimately, her death.  ECF No. 311-4 at PageID ## 3405-06.  The QMC Defendants argue that the negligence-based claims against them must be dismissed because there is no evidence that Bianca aspirated.  ECF No. 310-1 at PageID ## 3343-44.  In support

---

[4] To be clear, the QMC Defendants do not attempt to provide any *evidence* that the individual Defendants, Dr. Ho and Dr. Hsu, did not violate one or both standards of care (i.e., that other parties—not Dr. Ho or Dr. Hsu—failed to administer thiamine and failed to control for nausea and vomiting or check for gastric residuals).  Rather, the QMC Defendants reassert the argument already rejected in the court's *Daubert* order that, as a matter of law, the claims against them must be dismissed because Dr. Systrom failed to identify each individual Defendant's alleged violation of care.

of their position, the QMC Defendants rely solely on the testimony of a nurse who had been involved with Bianca's care, and who testified that she did not observe Bianca aspirating.  ECF No. 311-10 at PageID # 3498.  This testimony, they claim, leaves no genuine issue of material fact that Bianca did not aspirate.

But Plaintiff disputes this fact.  Dr. Systrom testified that, based on his review of Bianca's medical records and history, he believes she suffered from aspiration pneumonia:

> [T]he patient went down with adequate saturations and returned significantly hypoxemic, then documented by a blood gas, and then a chest x-ray showed new airspace disease in a gravity-dependent portion of the lung.  So the combination of newly acquired airspace disease and hypoxemia in this setting in a confused patient who's nauseated and vomiting and intermittently getting Zofran is aspiration pneumonia.

ECF No. 323-5 at PageID # 4609.  Thus, although the nurse stated that she did not observe Bianca aspirating, this is disputed by Dr. Systrom's opinion (based on Bianca's medical records) that she did aspirate and experience aspiration pneumonia.  Viewing the evidence in the light most favorable to Plaintiff, there is a disputed issue of material fact as to whether Bianca aspirated and thus experienced aspiration pneumonia.

### 3.    Plaintiff's Allegations Unrelated to Dr. Systrom's Testimony

The QMC Defendants identify a litany of negligent actions (or inactions) alleged in the SAC.  They argue these "theories of liabilities" must be dismissed because Plaintiff has provided no expert testimony that such acts violated medical standards of care.  Put differently, QMC Defendants assert that Dr. Systrom's testimony is limited only to his two standard-of-care opinions relating to (1) failure to administer thiamine prior to the administration of glucose; and (2) failure to protect Bianca from aspiration pneumonia by preventing nausea and vomiting and checking for gastric residuals.  Thus, they argue, the other alleged "theories of liability" are unsupported by expert testimony and must be dismissed.

Specifically, QMC Defendants argue that the following "theories of liability" should be dismissed:

(1) sepsis misdiagnosis (¶ 24),
(2) failure to treat sepsis and other ailments (¶¶ 26-27 & 29),
(3) failure to perform CT scan (¶¶ 28 & 36),
(4) administering vancomycin and Flagyl (¶ 34),
(5) discontinuation of the "banana bag" (¶ 38),
(6) abandonment in the emergency department (¶ 42),
(7) administrations of Fentanyl (¶¶ 48, 50-52 & 117),
(8) administration of Ativan (¶¶ 54-55),
(9) failing to check Bianca's CIWA score,
(10) leaking and replacement of IV lines (¶ 57),
(11) administration of heparin and placement of the central venous

14

catheter ("CVC") and obtaining related consent (¶¶ 58-73, 77-80 & 84-88),

(12) use of the CVC (¶ 81),

(13) placement of the NG tube causing aspiration (¶ 90),

(14) failure to consider non-invasive intubation and to measure arterial blood gas ("ABG") prior to intubation (¶¶ 95-96, 102-105, 108-110, 115),

(15) administration of versed and Rocuronium relating to the intubation (¶¶ 97-98),

(16) performing a CT after the intubation (¶¶ 99-100),

(17) administration of Precedex (¶¶ 118-119),

(18) administration of vasopressors (¶¶121-123),

(19) administration of Propofol (¶ 124),

(20) erroneous explanations by Dr. Gallacher (¶¶ 129-131),

(21) administration of unnecessary tests (¶132),

(22) organ donations, consent and the Legacy of Life (¶¶ 134-136), and

(23) flawed organizational department structure and communications (¶¶ 139-140).

ECF No. 310-1 at PageID ## 3341-42 (citing the SAC).  The court agrees—at least to the extent that these allegations are construed as "theories of liability."  Plaintiff has offered no expert testimony in support of these "theories of liabilities."  And failure to proffer expert testimony establishing the applicable standard of care and legal causation is a death knell to medical negligence claims under Hawaii law. *See, e.g.*, *Est. of Frey*, 146 Haw. at 557, 463 P.3d at 1214.

But Plaintiff does not appear to argue that she should be able to present these allegations as theories of liability.  Instead, she argues that she should be permitted to introduce facts related to some of these allegations in order to

provide necessary context to Dr. Systrom's standard of care opinions.  *See* ECF

No. 323 at PageID # 3636.  Again, the court agrees.  Plaintiff will not be allowed

to proceed with these allegations as "theories of liabilities."  But this *does not*

preclude Plaintiff from putting forth certain *facts* to provide context—so long as

Plaintiff can tether such facts to Dr. Systrom's opinions at trial and does not

attempt to impermissibly introduce claims unrelated to his two standard-of-care

opinions.[5]  At this stage, however, the court is not in a position to determine

exactly which facts will or will not be permitted at trial.

> Accordingly, the court GRANTS the QMC Defendants' Motion for
Summary Judgment as to the above identified allegations of deficient medical
treatment to the extent that they are presented as "theories of liability."  But the
court DENIES the QMC Defendants' Motion with respect to the negligence claims
against them based upon Dr. Systrom's standard-of-care opinions.

///

///

---

[5]  At oral argument, all parties conceded as much. That is, the parties appear to agree that Plaintiff should not be permitted to introduce new "theories of liabilities" beyond Dr. Systrom's two standard of care opinions, but may be permitted to introduce certain facts (to be determined later by the court) so long as she can show that these facts relate to Dr. Systrom's opinions.  The remaining question—which the court will not consider at this stage—is exactly which facts may be admissible.

16

**B.      Count II: Gross Negligence for Failure to Adequately Supervise**

In Count II, Plaintiffs assert a cause of action against the QMC

Defendants for negligent supervision of HRP resident physicians, Drs. Ariyoshi

and Spanuchart.  ECF No. 190 at PageID # 1562.  The QMC Defendants argue that

this claim should be dismissed because "Hawaii has not recognized a cause of

action against hospitals and physicians for negligent supervision of residents."[6]

ECF No. 310-1 at PageID # 3350.

As a preliminary matter, the 2011 Agreement establishing the

residency program at QMC vests QMC and its physicians with a contractual

responsibility for "providing adequate supervision of the resident(s) . . . while

rotating at [QMC]."  ECF No. 322-3 at PageID # 3546; *see also Takemoto v.*

*United States*, 2020 WL 7698829, at *5-9 (D. Haw. Oct. 20, 2020) (applying

Hawaii law to uphold contractual agreement delineating responsibility for U.S.

military resident physicians on rotation at QMC).  Thus, the QMC Defendants

were generally responsible for supervising Drs. Ariyoshi and Spanuchart.

This contractual responsibility does not, however, answer the question

of whether Hawaii law recognizes a claim for negligent supervision against a

---

[6] The parties do not address whether different standards would apply to the hospital or the individual physicians and the court, accordingly, does not reach this question.

hospital or supervising physicians.  As the QMC Defendants correctly point out, the Hawaii Supreme Court has not specifically identified a duty of a hospital or attending physician to supervise resident physicians.  But a judge in this court has predicted that "the Hawaii Supreme Court would recognize a cause of action against a hospital for the negligent supervision of physicians."  *Domingo By & Through Domingo v. Doe*, 985 F. Supp. 1241, 1247 (D. Haw. 1997), on reconsideration, Jan. 7, 1998.  And, indeed, as explained in *Domingo*, "Hawaii courts have, in general, recognized the validity of a cause of action for negligent supervision," *id.* (citing *Abraham v. S. E. Onorato Garages*, 50 Haw. 628, 633-35, 446 P.2d 821, 825-26 (1968)), while other state courts have specifically "concluded that a hospital has a duty to supervise the doctors on its medical staff," *id.*  The court agrees with *Domingo*—a claim for negligent supervision of resident physicians exists in Hawaii law.

But the scope of such a claim is not absolute.  *Id.* ("The courts which have recognized this cause of action have not imposed an absolute duty upon the hospital to ensure the safety of its patients.").  Instead, the duty to supervise is imposed only where "the hospital knows or should know of the physician's deficient treatment or where the physician's negligence is obvious."  *Id.*; *Abraham*, 50 Haw. at 634, 446 P.2d at 826 ("It is essential for liability that there be a

18

showing by the plaintiff that the employer knew or should have known of the necessity and opportunity for exercising such control.") (citing Restatement (Second) of Torts § 317 (1965)).  This common-law rule is derived from the Restatement (Second) of Torts, *see Dairy Rd. Partners v. Island Ins. Co., Ltd.*, 92 Haw. 398, 427, 992 P.2d 93, 122 (2000), which provides that:

> The mere fact that the servants are using the master's chattels dangerously or misconducting themselves upon the master's premises is not enough to make the master liable.  It is necessary to show that the master knew of the practices, and that he did not take the appropriate steps to stop them; or at least that he reasonably should have discovered them.

Restatement (Second) of Torts § 317 n.1.[7]

Applying this rule, *Domingo* concluded that the hospital could not be held liable for negligently supervising a surgeon with a history of substance abuse issues because the plaintiffs "[did] not provide the court with any evidence which suggests that [the surgeon] was negligent in performing any [past] surgeries or that [his] substance abuse in any way affected his ability to perform these surgeries." 985 F. Supp. at 1248.  Likewise, here, Plaintiffs have provided no evidence to

---

[7] In their Opposition, the HRP Defendants assert that QMC should be held liable for negligent supervision because of their general duty to supervise the residents.  ECF No. 321 at PageID ## 3526-27.  But this argument misapprehends, or else wholly disregards, the test for negligent supervision under Hawaii law.

suggest that the residents had a history of negligence such that the QMC Defendants knew or should have known that the residents would likely provide negligent care to Bianca.[8]  Based on the factual record before the court, there is no triable issue of material fact as to QMC's liability for negligent supervision.

In addition, following the Restatement, the Hawaii Supreme Court has repeatedly made clear that negligent supervision "may only be found where an employee is acting *outside* of the scope of his or her employment." *Pulawa v. GTE Hawaiian Tel.*, 112 Haw. 3, 18, 143 P.3d 1205, 1220 (2006) (emphasis in original) (quoting *Dairy Rd. Partners*, 92 Haw. at 427, 992 P.2d at 122 ("Inasmuch as negligent supervision may only be found where an employee is acting outside of the scope of his or her employment, the complaints in the underlying lawsuit cannot be said to state a claim for negligent supervision.")).

---

[8] In her Opposition, Plaintiff contends that "[w]ith respect to Drs. Ariyoshi and Spanuchart, each were blatantly deficient in their treatment of Bianca as reflected in the medical record, which deficiencies should have been immediately apparent to QMC's supervising physicians." ECF No. 323 at PageID # 3650.  The only factual support Plaintiff appears to offer for this proposition is a citation to Bianca's voluminous medical records.  ECF No. 324 at PageID # 4642.  This showing is inadequate.  At the summary judgment stage, plaintiffs must link their arguments to specific evidence in the factual record.  *See In re Caneva*, 550 F.3d 755, 761 (9th Cir. 2008) (quoting Fed. R. Civ. P. 56(e)).  Here, Plaintiff has failed to do so.  And the court will not, like "[a] pig[] sniffing for truffles," root through the factual record on Plaintiff's behalf.  *Downs v. Los Angeles Unified Sch. Dist.*, 228 F.3d 1003, 1007 n.1 (9th Cir. 2000) (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir.1991)); *see also McMullen v. S. Cal. Edison*, 2009 WL 10698216, at *7 (C.D. Cal. Oct. 21, 2009).

Conduct is within an individual's scope of employment if: "(a) it is of the kind he is employed to perform; (b) it occurs substantially within the authorized time and space limits; and (c) it is actuated, at least in part, by a purpose to serve the master." *Wong-Leong v. Haw. Indep. Refin., Inc.*, 76 Haw. 433, 438, 879 P.2d 538, 543 (1994) (quoting Restatement (Second) of Agency § 228 (1958)). In contrast, conduct "is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master." *Id.* (quoting Restatement (Second) of Agency § 228).

Here, the Complaint alleges that Drs. Ariyoshi and Spanuchart were negligent in their provision of medical care to Bianca. This allegedly negligent conduct is clearly within the scope of the doctors' employment as resident physicians. Indeed, the core duty of residents is to provide care to patients. *See* ECF No. 322-4 at PageID # 3555. And Plaintiff has put forth no evidence to suggest that the residents were in any way acting outside the scope of their employment in their interactions with Bianca.[9] There is no genuine issue of

---

[9] To the contrary, Plaintiff appears to admit that the residents were acting within the scope of their employment. In Count III, Plaintiff alleges that "[t]he negligent and wrongful acts of Defendant QMC's agents and employees were committed *while acting within the course and scope of their employ and/or agency with Defendant.*" ECF No. 190 at PageID ## 1563-64

(continued)

21

material fact supporting a claim for negligent supervision against the QMC

Defendants under Hawaii law. *See, e.g.*, *Yoshikawa*, 2021 WL 54363, at *13

(finding no negligent supervision claim based on plaintiff's allegation that a city

building inspector incorrectly interpreted and enforced various municipal laws

because he was acting within the scope of his employment); *Vargas v. City &*

*Cnty. of Honolulu*, 2020 WL 3547941, at *22 (D. Haw. June 30, 2020) (allowing a

claim against police department for negligent supervision of a police officer

because the officer's alleged conduct—sexually assaulting the plaintiff while on

duty—was clearly outside the scope of his employment). QMC's Motion for

Summary Judgment is GRANTED as to Count II.

## C.     **Count III**: **General Negligence Against QMC**

In Count III, Plaintiff asserts a claim of negligence against QMC (but

none of the individual QMC Defendants) for failing to implement proper

procedures, recognize deviations from standards of care, and properly train and

supervise its employees, agents, and physicians. *See* ECF No. 190 at

---

(emphasis added). And that "[r]esidents under the control and supervision of the doctors in the Queens Medical Center *and working on behalf of the hospital were individually negligent in the execution of their duties*." *Id.* at PageID # 1563 (emphasis added). Because Plaintiff appears to admit that the residents were acting within the scope of their employment when providing medical care to Bianca, her negligent supervision claim cannot succeed. *See Yoshikawa v. City & Cnty. of Honolulu*, 2021 WL 54363, at *13 (D. Haw. Jan. 6, 2021) (rejecting negligent supervision claim, in part, based on the plaintiff's admission in the complaint that the claim was based on acts that an employee took within the scope of his employment).

PageID ## 1562-63.

In their Motion, the QMC Defendants first argue for summary judgment as to this count because "Plaintiff has no expert opinion concerning these alleged negligent acts." ECF No. 310-1 at PageID # 3352. This argument fails. While Hawaii law requires expert opinion as to *medical* standards of care, the QMC Defendants have not provided (nor was the court able to identify) authority suggesting that expert testimony is required for claims related to protocol and processes or to supervising and training residents. That is not to say that expert testimony may never be required for such claims; rather, based on the evidence presented for this Motion, it does not appear that expert testimony is required.[10]

QMC Defendants next make a more limited argument, asserting that—setting aside any other individual Defendants—QMC cannot be held liable for the conduct of Drs. Ariyoshi and Spanuchart because they "were not employees or agents of QMC," but instead were "independent contractor[s]." *Id.* at PageID # 3353. Plaintiff responds that under common law principles of agency, the relationship between QMC and the residents is functionally that of employer and

---

[10] To be clear, the court is only ruling based on the evidence presented with the instant Motion. From the face of the Complaint it is unclear exactly what arguments Plaintiff may make in advancing this claim. If, at trial, Plaintiff advances arguments that require technical understanding, an expert witness may be deemed necessary.

employee (i.e., master and servant), meaning that QMC can be held vicariously liable for their conduct.  ECF No. 323 at PageID ## 3650-51; *see also State v. Hoshijo ex rel. White*, 102 Haw. 307, 318, 76 P.3d 550, 561 (2003).  The court agrees with Plaintiff.

For the purposes of this Motion, the QMC Defendants offer no support for their assertion that the resident physicians are independent contractors.  And the legal agreements between HRP, QMC, and the University that define the role of resident physicians at QMC suggest otherwise.  At no point do any of these agreements specify that residents are independent contractors.[11]  Instead, they delineate which entities have supervisory authority and control over residents in a manner that reflects a traditional master and servant (employer and employee) relationship.

The 2014 Affiliation Agreement between QMC and the University provides that residents are neither employees nor agents of the University, but are instead employees of HRP.  ECF No. 322-5 at PageID ## 3598-99.  The

---

[11] The 2014 Affiliation Agreement between QMC and the University provides that "[i]n the performance of the services, duties, and obligations under this Agreement, the University and [QMC] shall at all times act and perform as 'independent contractors,' each with the authority and responsibility to control and direct the performance and details of its services, duties, and obligations required under this Agreement."  ECF No. 322-5 at PageID # 3598.  The Agreement *does not*, however, suggest that residents *themselves* operate as independent contractors.

Agreement does not explicitly define the relationship between residents and QMC, but it does provide that "the care of the patient [treated by a resident] is the responsibility of the [QMC] attending physician" and that "[QMC] has an obligation to provide care for the patients of all physicians on the [QMC] staff." *Id.* at PageID # 3595. Thus, although residents may treat patients, the responsibility for their care rests with attending QMC physicians (and, ultimately, with QMC).

Next, the employment contract between residents and HRP in effect at all times applicable provides that:

> HRP is *not* responsible for day-to-day supervision of the Resident's academic and patient care (clinical) work, and this work will be overseen by [the University] and/or each Hospital (defined in this Agreement to include any participating sites, medical institutions, clinics or medical offices), to which the Resident is assigned during the period of this Agreement.

ECF No. 322-6 at PageID # 3605 (emphasis added).

Thus, as relevant here, the HRP employment contract provides that the parties empowered to exercise control over residents are either the University or QMC. And, in a 2011 Letter of Agreement, the University and QMC delineated that responsibility, stipulating that QMC is the party "responsible for the administration, education and supervision of the resident(s) while rotating at

[QMC]."  ECF No. 322-3 at PageID # 3545; *see also id.* at PageID # 3546

(providing that "[QMC]'s Training Coordinators and/or their designees will be

responsible for providing appropriate teaching of the resident(s), along with

providing adequate supervision of the resident(s)" while they are on rotation at

QMC).

   Further, Drs. Ariyoshi and Spanuchart testified that QMC, through its

physicians, did in fact exercise supervisory authority over them in this case.  Dr.

Spanuchart testified that he was "always" under the supervision of QMC

physicians while working at the hospital.  ECF No. 322-7 at PageID # 3617.  And

Dr. Ariyoshi likewise testified that QMC physicians consistently oversaw his work

at QMC.  ECF No. 322-8 at PageID # 3621.

   This evidence is sufficient to demonstrate—for the purposes of

summary judgment—that the residents likely were not independent contractors but

"employees" of QMC while on rotation there.  The differentiating factor between

an employee and an independent contractor is the degree of control exercised by

the master.  *Locations, Inc. v. Haw. Dep't of Lab. and Indus. Rel.*, 79 Haw. 208,

211, 900 P.2d 784, 787 (1995).  To determine whether an individual is an

employee or independent contractor, courts apply a "control test," which controls

regardless of the individual's formal employment status.  *See id.* (citing *Bailey's*

*Bakery v. Borthwick*, 38 Haw. 16 (1948)); *see also Nakagawa v. Apana*, 52 Haw. 379, 385, 477 P.2d 611, 615 (1970).  Under the control test, an individual is an employee if "the person in whose behalf the work is done has the power, express or implied, to dictate the means and methods by which the work is to be accomplished." *Locations, Inc.*, 79 Haw. at 211, 900 P.2d at 787 (quoting *Tomondong v. Ikezaki*, 32 Haw. 373, 378 (1932)).  In contrast, an individual is an independent contractor if they "contract with another to do a specific piece of work . . . and . . . executes the work . . .  without being subject to the latter's orders in respect of the details of the work, with absolute control thereof." *Id.* (quoting *Tomondong*, 32 Haw. at 378 (1932)).

Here, because the residents' treatment of Bianca was subject to the supervision of the attending physicians, and because those physicians were ultimately responsible for her care, there is at least a genuine issue of material fact as to whether the residents lacked the degree of autonomy over their work required to be considered independent contractors and were instead functionally the employees of QMC while on rotation there.  And it is well-settled under Hawaii law that a master can be held vicariously liable for the conduct of its employees. *Hoshijo ex rel. White*, 102 Haw. at 318, 76 P.3d at 561.  The QMC Defendants'

argument that QMC cannot be liable for the residents' conduct because they were independent contractors fails.

Moreover, even if the residents *could* be considered independent contractors, QMC still would not be entitled to summary judgment. *Bynum v. Magno*, 125 F. Supp. 2d 1249 (D. Haw. 2000), discussed vicarious liability of physicians operating as independent contractors, noting that "cases from around the country have held that although a hospital is generally not liable for the negligence of a physician who is an independent contractor, a hospital may be liable for a physician/independent contractor where he/she is cloaked in the apparent authority of the hospital, i.e., where the patient reasonably believes that the doctor is an agent of the hospital." *Id.* at 1265. The *Bynum* court predicted—and this court agrees—that the Hawaii Supreme Court would adopt the majority test for apparent authority, which requires a plaintiff to affirmatively establish that "(1) he/she had a reasonable belief that [the] physician was [an] agent/employee of the hospital, (2) the belief was generated by some affirmative act of the hospital or physician, and (3) the patient justifiably relied on the representation of authority." *Id.* at 1265.

The QMC Defendants argue that the *Bynum* test is subjective, as opposed to objective, and that Plaintiff cannot prevail because she has offered no

evidence of Bianca's subjective belief that the resident physicians were agents or employees of QMC.  The court disagrees.  First, *Bynum* articulates a reasonableness standard, which suggests that the test is objective rather than subjective.  And, second, a subjective test would frustrate the administration of justice by enacting a complete bar to vicarious liability claims in wrongful death suits.  In such cases, plaintiffs are necessarily unaware of any harms until after the victim has passed away, making it impossible to acquire evidence as to the decedent's subjective belief at the time of treatment, as would be required if the test was subjective.  A subjective test, then, would make it untenable for plaintiffs in wrongful death cases to ever proceed.  The court concludes that the *Bynum* test requires a plaintiff to establish each of its elements under an objective standard.

Applying that test, the court concludes that Plaintiff has put forth sufficient evidence as to whether Bianca reasonably believed the residents were employees or agents of QMC.  First, as discussed above, the residents were, in fact, under the direct supervision and control of the QMC attending physicians.  Their deference to QMC attending physicians reasonably suggests that the residents were acting as agents of the hospital rather than independently.  Moreover, although QMC consent forms given to Bianca disclosed that "[m]any physicians and certain other healthcare professionals providing medical services" were independent

contractors, the forms did not specifically identify which doctors were operating as such.  ECF No. 323-4 at PageID ## 4600-01.  In fact, the forms indicated that groups including emergency care, radiology, medical imaging, and pathology were independent contractors, implying that groups not specifically identified—including ICU physicians, like the residents—were *not* independent contractors.  In short, there is at least a triable issue of fact as to whether Bianca reasonably believed that the resident physicians were not employees or agents of QMC.  *See Bynum*, 125 F.Supp.2d at 1266 (finding plaintiff had sufficient evidence to establish apparent authority between an independent contractor physician and QMC because the forms presented to the plaintiff bore the name of QMC, and because the plaintiff was unfamiliar with the doctors and had no reason to believe they were not agents of the hospital).

Regardless of whether the residents were employees or independent contractors of QMC, there is a genuine issue of material fact as to whether the hospital may be held vicariously liable for their conduct.  The QMC Defendants' Motion as to Count III is DENIED.

///

///

///

## D.    Damages and Expenses

Finally, the QMC Defendants argue that Plaintiff is not entitled to punitive damages or to expenses of the deceased's last illness and burial pursuant to Hawaii Revised Statutes ("HRS") § 663-3(a).

### 1.    *Punitive Damages*

"Punitive or exemplary damages are generally defined as those damages assessed in addition to compensatory damages for the purpose of punishing the defendant for aggravated or outrageous misconduct and to deter the defendant and others from similar conduct in the future." *Masaki v. Gen. Motors Corp.*, 71 Haw. 1, 6, 780 P.2d 566, 570 (1989).  "In determining whether an award of punitive damages is appropriate, the inquiry focuses primarily upon the defendant's mental state, and to a lesser degree, the nature of his conduct." *Id.* at 7, 780 P.2d at 570.

"'Punitive damages are not awarded for mere inadvertence, mistake, or errors of judgment.'" *Ass'n of Apartment Owners v. Venture 15, Inc.*, 115 Haw. 232, 297, 167 P.3d 225, 290 (2007) (quoting *Masaki*, 71 Haw. at 7, 780 P.2d at 571) (emphasis omitted).  Rather, the Hawaii Supreme Court has explained:

> In order to recover punitive damages, "the plaintiff must prove by clear and convincing evidence that the defendant has acted wantonly or oppressively or with

31

> such malice as implies a spirit of mischief or criminal indifference to civil obligations, or where there has been some wilful misconduct or that entire want of care which would raise the presumption of a conscious indifference to consequences."

*Id.* (quoting *Masaki*, 71 Haw. at 16-17, 780 P.2d at 575) (brackets omitted).

The standard for punitive damages appears to encompass the standard for gross negligence, which is the "entire want of care [raising] the presumption of a conscious indifference to consequences." *Mullaney v. Hilton Hotels Corp.*, 634 F.Supp.2d 1130, 1154 (D. Haw. 2009); *see also Pancakes of Haw., Inc. v. Pomare Props. Corp.*, 85 Haw. 286, 293, 944 P.2d 83, 90 (Haw. App. 1997) (defining gross negligence as "[i]ndifference to a present legal duty and utter forgetfulness of legal obligations so far as other persons may be affected") (citation and quotation signals omitted)).

Because the gross negligence claims against the QMC Defendants survive summary judgment, disputed issues of material facts necessarily remain as to whether Plaintiff can meet the standard for punitive damages.  Accordingly, the court DENIES the QMC Defendants' Motion for Summary Judgment as to punitive damages.

///

///

32

### 2.    *Hawaii Revised Statutes § 663-3(a)*

The QMC Defendants also argue that Plaintiff is not entitled to reasonable expenses for Bianca's last illness and burial costs pursuant to HRS § 663-3(a) because the statute awards such expenses to the decedent's estate.  But Plaintiff did not seek such relief pursuant to § 663-3(a) in her Complaint, *see* SAC, ECF No. 190 at PageID # 1565-66, and she concedes that she is not entitled to expenses under the statute.  *See* ECF No. 323 at PageID # 3654.  Accordingly, the court DENIES as moot QMC Defendants' Motion for Summary Judgment as to damages under HRS § 663-3(a).

///

///

///

///

///

///

///

///

///

///

# V.  **CONCLUSION**

For the foregoing reasons, the court GRANTS in part and DENIES in part QMC Defendants' Motion for Summary Judgment, ECF No. 310.

The court GRANTS QMC Defendants' Motion for Summary Judgment as to the allegations unrelated to Dr. Systrom's two standard-of-care opinions.  The court otherwise DENIES QMC Defendants' Motion for Summary Judgment.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, May 25, 2021.



/s/ J. Michael Seabright
J. Michael Seabright
Chief United States District Judge

*Krizek v. Queens Med. Ctr., et al.*, Civ. No. 18-00293 JMS-WRP, Order Granting in Part and Denying in Part Defendants The Queen's Medical Center, Wendy W. Hsu, M.D., and Hao Chih Ho M.D.'s Motion for Summary Judgment, ECF No. 310.